Bruce Wexler for the Plaintiff, Boehringer Ingelheim. The first issue in this case, the terminal disclaimer issue, is sui generis to a Hatch-Waxman Patent Act infringement case where you have a terminal disclaimer filed against a reference patent that has a statutory term. But the case does not end because there is a patent term extension under section 156 that starts from the expiration date of the underlying patent, the reference date of the terminal disclaimer. And what makes this case seemingly unusual, or at least two kind of unique things to this case, in contrast to at least the precedent I know of, is one, that the patent here, the earlier patent, had already expired, correct? Yes. And two, that the extension you all got on 156 was on a narrower, was only on a product, and it was limited to just a particular use, and therefore wasn't coextensive with the scope of the patent. Am I right about that? Right. The term extension applies to the patent, but then there's provision that provides that it's enforceable with respect to the product that's approved and the uses. Right. It's a narrower scope. Narrower scope, yes. So how do you, I mean, so those are the two problems I'm having as to how you overcome the district court's conclusion in light of those two factors, which I think make this case different from any of those that are previously cited. Right. And Your Honor, I agree that this case is different and sui generis. So in a non-hatch waxman patent case, if the terminal disclaimer is filed, it would be effective to reset the expiration date to the earlier date, but the case would essentially be over because there's no more patent rights to enforce. And that's the reason for the dicta in Lilly and Lenardo, where the terminal disclaimer hadn't been filed, but if it would have, this court surely would not have said, the terminal disclaimer is ineffective, let me go on and talk about double patenting. So the point here is that- The issue could come up in other cases, couldn't it, in the sense that there's an infringement suit, there's a challenge to the validity of the patent on double patenting grounds, the patent's expired, but you're still litigating infringement, and there's a terminal disclaimer filed after the expiration of the first patent. It's not unique, that's not unique to hatch waxman, right? And in that case, Your Honor, if you file the terminal disclaimer to the already expired patent, you have a situation like the Lilly case, you'd have an expired patent. Everybody would say, you filed this terminal disclaimer, the patent's now expired, we're done, we're not going to go on and distress double patenting. So the effect of refusing to recognize the terminal disclaimer is to create more litigation. That's the only real effect. But, I'm sorry, this issue could come up in a non-hatch waxman situation, right? And we haven't resolved it in that situation either, have we? No, you haven't either. But in a non-hatch one, well, in Perricone, the court on remand said that you could file the terminal disclaimer where the patent had been found invalid in the assist case, the patent was found invalid, but then terminal disclaimer was filed. I'm talking about expiration here. Right. The court has not addressed that issue. So it's not, this isn't unique to hatch waxman. We could have this situation with respect to any patent, where there's an infringement litigation, an effort to avoid a double patenting issue by filing a terminal disclaimer after the expiration of the first patent, right? It's unclear why that would happen in a regular litigation, because once you file that terminal disclaimer, if this court gives effect to that, you've reset the expiration. Well, that's the question. The question is whether we would give effect to it or not if it was, if the terminal disclaimer was filed after the expiration of the first patent. And if the court does give effect to it, the patent is now expired. So everybody is, it resolves litigation. I understand. But the question is whether you can get out from under the double patenting issue by filing a terminal disclaimer after the expiration of the first patent. And the point, I'm sorry. So we have cases, if I recall correctly, that you can't file a terminal disclaimer unless you have joint ownership of the two patents, correct? That's correct. So why isn't that sort of comparable to this situation? You shouldn't be able to file a terminal disclaimer if the first patent is expired and you no longer have ownership of it in a sense. Well, you still have ownership of the patent. I understand. I think this is- Why aren't those two situations analogous in other words? Because the ownership still persists. The terminal disclaimer sets the expiration date to that of the earlier patent. And if you do that, you end the double patenting issues and you don't have to go on to decide them. Now, another analogy might be the regular disclaimer. If you, let's say, have four claims in a patent, one is invalid. You can file a regular disclaimer of that claim during the litigation. And in 1950, the DOJ argued that that creates a chilling effect. You shouldn't be able to do that. Congress rejected that and didn't put a timing limitation in. So you can file that disclaimer of a claim that's invalid. Congress rejected the idea of this chilling effect. But invalid and expired are different. It's an analogous effect because it's a claim that's sitting out there that theoretically is having effects, but you disclaim it and you get rid of it during the litigation. Here we have a double patenting rejection. And in effect, there's already been the enjoyment of the full scope of coverage prior to the terminal disclaimer. And the fact that the scope of coverage is exactly the same as, and is less than, the scope of coverage of the full set of claims that are in the patent. I mean, normally in a terminal disclaimer, you're seeking to avoid the problem of an extension of monopoly, extension of coverage. But you've already enjoyed that. The patent, the original patent has already expired. You can't give that back. Well, to the extent that it's not coextensive with the extension under Section 156, means that you've got that packet of rights that you've already enjoyed. And you can envision a situation where perhaps there was a party out there that might have done something that refrained from doing something, recognizing that there was coverage in place that was beyond the scope of the extension coverage. It seems to me that this is so. So I guess this is my long-winded way of saying that I think this is distinguishable from the Merck case, for example. Your Honor, yes. I'm familiar with the Merck case and I agree that Merck is not controlling, but the principles of Merck apply, which are that what you're seeking to do with regard to this defendant in this case, in this context, is enforce the patent term extension right only prospectively. In Merck, by the time of the litigation, the underlying reference patent had expired. So the only thing that was being enforced was the patent term extension. And I will say that it's hypothetical, and that's one of the reasons this is hypothetical speculation about a different defendant who sees this patent. Now, that's six months. I don't think it's a different defendant. I think that Judge Lynn's question is directed to what's the policy here? And the risk is, even if you assume that the terminal disclaimer is retroactive and wipes out any infringement liability, which probably it does, but even if you assume it's retroactive, the risk is that competitors would have been deterred in the interim period. That may or may not have happened in this particular case, but as a matter of policy, the question is, should you allow terminal disclaimers after expiration? And the risk that Judge Lynn is pointing out to you is that people would misuse the patent during the period before the disclaimer to discourage competition. And should that be allowed? What's the answer to that? There's two answers to that, Your Honor. The first is that if the question is whether to give effect to the terminal disclaimer, that's the question presented. If the answer is no, don't give effect to the terminal disclaimer, let's take the hypothetical person you just talked about. That person, the consequence for that person now is they have to litigate to final conclusion and appeal the double patenting issue. If an option for that person is to file a terminal disclaimer, it ends the litigation for that person and irrevocably for the public. Terminal disclaimers are always good when filed. That seems to be an argument that there's a countervailing policy consideration, but the risks that Judge Lynn has identified to you are real risks, right? That both patents continue, competitors are discouraged, and that the filing of the terminal disclaimer later on doesn't cure the discouragement that's happened during the earlier period. And the discouragement is something that is not going to be necessarily the subject of any litigation. That's simply conduct that may have occurred that we will have no way of knowing. But as Judge Dyke points out, it's a policy question. Yes, Your Honor, it's a policy question. If you look at that policy question, that six-month window is somewhat arbitrary in that that theoretical chilling effect could occur even before the six-month window. It's the existence of the two patents that presents the chilling effect, but you can file terminal disclaimers in issued patents. And Congress made clear that a theoretical chilling effect is not a reason to deny disclaimers because the outcome of a ruling. Where did Congress make that clear? In 1952, Congress took out a timing limitation on the filing of disclaimers over an objection by the Department of Justice that the timing limitation was important to avoid misleading impressions of the scope of the patent and discouraging the public's use of technology that it's entitled freely to use. The balance has been struck in favor of disclaimers because they end the litigation. In this case, for example, in Faust, they talk about, this is what's predecessor talks about, a disclaimer avoids the need to talk about exceedingly complex double patenting issues. In the situation where a person is outside the term extension, I submit that the terminal disclaimer, if effective, for that person is better than a finding of invalidity because it ends the patent for that person right then and there. They don't have to go up on a final decision at trial court. They don't have to come to your honors for appeal. It ends right then and there. For Milan, who is the defendant in this case, and who we are talking about enforcing a patent term extension again, there is no difference. Milan is within the patent term extension. They stipulated to infringement of Claim 7. They're using this drug. The very existence of their ANDA, the only existence of the ANDA, the quid pro quo, is this patent term extension. Mr. Rexler, you're into your rebuttal, but we'll give you a few more minutes. Do you want to briefly address the consonants issue, the Section 121 issue? Yes, thank you, Your Honor. And please be brief. I'll be very brief. This case involves a divisional of a divisional that carves up distinct invention groups, groups 1 and 3 to 5 of the original. But just to try to focus the consonants issue, the application for the 812 patent was not consistent with the restriction in the sense that you have these compound claims from different groups that were joined together, which under the original restriction wasn't permissible. So why isn't there a lack of consonants? Because the original restriction requirement was, the examiner said, restriction of the following inventions, listed 10 groups, said each invention is distinct one from the other. If the 812 application had been submitted to the original examiner who imposed this restriction, it would not have been consistent with my restriction requirement, right? I respectfully disagree, because the 086 patent, Your Honor, had method claims in it that covered the use of the compound claimed in the first patent, 374. So the first patent claimed a method. Your argument or your answer to Judge Dyke is dependent, is it not, on our concluding that the restriction requirement was this small thing, about the claims each being separate, and then this other language or requirement that the examiner imposed was not part of the restriction requirement, correct? Yes, that was an election. Why would we conclude that? I mean, what is it about the document or the process that would lead us to distinguish between those two determinations? Because if you were to say that this election of one compound and one method was the restriction requirement, as opposed to the express language talking about distinct invention groups, each distinct from the other, if you say that that's the restriction requirement, then the applicant would have had to file 15 patent applications, three methods and five compounds. And even in that case, they still wouldn't have, they still would be dividing compounds, because you'd have one method, one compound, then another method with that compound. So no matter what, if the election is the restriction, number one, you'd have to file 15 applications. Well, maybe so, but that would suggest that the restriction was too severe, it wasn't a good idea. But we're not concerned with that now. The question is, what was the restriction? And would the examiner have allowed these four groups to be joined? Let's assume hypothetically that we conclude that the original examiner would have said no. These four groups that are in the 812 patent application are not properly joined. Let's assume that he would have rejected that under the restriction requirement he imposed. Then there's a lack of consonants, correct? I think, Your Honor, the lack of consonants goes to the question of the individual groupings. Yes or no? No. Because the individual groupings is what you look at for consonants. Every case that's addressed, it looks at the distinct groupings. It's a standard way of looking at consonants. And you can claim in a single patent multiple distinct groups. What you can't do is split a group among two patents. I'm not sure you're answering my question. I'm saying, let's assume hypothetically that the original examiner had said, you've got to have no more than one group in a single patent. Let's assume that's the restriction requirement. And that the 812 application comes along and it has four groups. Is that consonant? I think it would be because 803 gives the examiner discretion to allow multiple distinct groups. The consonants goes to the distinctness. It looks at what are the distinct groups. And we know that the compounds and methods are distinct. I don't understand that. I mean, he said only one group. I'm posing a restriction requirement. You can only have one group in each patent. And the later patent has four groups. How's that consistent with the restriction? Because the restriction divides up the original patent into 10 distinct groups, each from the other. And then 803 of the MPEP gives discretion to allow more than one distinct group. Now, in the 374, he said, one left. What I'm saying is there's never a consonants problem if the second examiner doesn't adhere to the restriction. That's what sounds to me like is what you're saying. No. No. Everything fits comfortably together. If you have 10 distinct groups, the examiner sets forth that and defines the restriction requirement. The examiner says in the 374, put one method and one compound as part of discretion. Then they carve up the different distinct groups among the divisionals. If you're saying that, are you saying that the examiner, if the examiner exercises discretion later on and allows a different grouping, that nonetheless, the applicant is entitled to the shelter of section 121? No, Your Honor. I'm defining group the way the patent office did with the traditional way of group. There are inventions in 10 groups, and then it says each group is distinct one from the other. There are three statements in the restriction. The inventions are the following 10. Each is distinct one from the other. Each invention is distinct, and then there's a statement that the methods are distinct from the compound. Except the hypothetical, okay? The restriction is absolutely clear. It says that each one of these groups is a separate invention and must be the subject of a separate patent, okay? That's the initial restriction, okay? Then along comes the applicant in a second application. Instead of doing what the first examiner said that he had to do, that is to separate each group, he lumps four of the groups together. Is that consonant? I think the answer is it could be. The reason being, no case has said that putting distinct groups together violates consonants. What they're looking at for consonants is separating. But consonants with respect to the restriction that was imposed by the examiner. We're looking to see what the examiner said. The examiner said each group's a separate invention. Each group's got to be in a separate patent. Comes along a second time. They ignore that. They join more than one group together. Why isn't that a lack of consonants with a restriction that was imposed? Because consonants, the problem with consonants is that you're claiming back to one of the groups. If you look at the BMS case, Geneva. It's not simply claiming back. It's claiming the benefit of the shelter of 121. It's avoiding a rejection based on the fact that, no, no, no, all I did was comply with the restriction requirement and I cannot be penalized for doing that. That, it seems to me, that's the be all and end all with respect to consonants independent of any discretion the examiner might have. But consonants is looking for whether you tread back into, I mean, if you look at the BMS, the Geneva cases, there was a group that combined certain subject matter in that group, all not distinct from each other, and you claimed back into that group. There's been no case that you have a distinct group, two distinct groups, patents claiming multiple distinct groups, and it's been held invalid on that ground. It's a matter of efficiency to combine groups rather than have 15 applications. Am I right that the district court never addressed this issue? That's right, Your Honor. But you do agree it's a question of law, not a question of fact? Is that your view? Our position is that even if it's a question of law, the district court might, in the first instance, address it. However, as a question of law, this court- So are you seeking, are you asking that we send it back to the district court to decide these questions in the first instance? If this court would find that helpful, the answer is yes. As a matter of law, the court could decide it. But you also agree that you have the burden on the consonants question? I mean, it arises in the context of obviousness where you don't have the burden, but on the consonants question itself, do you agree that you would have the burden? I haven't seen that in the case law assigned that way. I think the burden of proof is on the defendant to prove invalidity. I think we probably have a burden of production of showing the restriction requirement and what the groups are, but I think the ultimate burden of persuasion remains with the defendant. All right. We'll restore five minutes for rebuttal and we'll give the appellee an additional eight minutes. Thank you, Your Honor. Good morning, Your Honors. Good morning. Shannon Bloodworth on behalf of the Appellee Mylan Pharmaceuticals, Inc. May it please the court. There are at least three reasons this court should decline to bend over backwards to save the Beringer Primapexol patent. First, and most fundamentally, it offends the basic logic. I don't think that's really the issue is whether we should bend over backwards to save the patent. You know, you listen to the argument, we got some, there's some legal issues here, like, you know, what's the statute mean, right? Yes, Your Honor. We don't start with the premise that we're bending over backwards to save a patent. Yes, Your Honor. The fact is that here, Beringer did not appeal the district court's finding of double patenting. The 812 patent is invalid for double patenting. Yeah, we understand that. Here, Beringer is trying to claim that they still have the right to prospectively enforce the more narrow Section 156 extension. But they say the statutory language doesn't limit them. So what's the answer to that? The answer is that the statutory language does limit them. The policy behind Section 253, the whole purpose behind terminal disclaimers, the whole purpose behind this court's jurisprudence on double patenting. Well, that may be policy, but that's not statutory language, is it? The statutory language in Section 253, that's what the statutory language Your Honor is referring to, does not have a specific time limitation. And there's legislative history in which Congress rejected the insertion of a specific timing requirement, correct? Yes, Congress did reject. They did amend the statute and reject inserting a specific time limitation. However, the last amendment to Section 253 was prior to the enactment of Section 156. So we should ignore that? That's the basis for ignoring the legislative history? Not to ignore it, Your Honor, but simply to say that Congress never envisioned the type of circumstance that we have here today where a patentee would be asserting rights nearly two years after the underlying patent had expired and file a terminal disclaimer to it. Well, as Judge Dyke, I think, pointed out early on in the argument, I mean, this question, do you agree or disagree that this question isn't necessarily just unique to the Hatch-Waxman context? That's correct, Your Honor, and we would agree that this question is not unique to the Hatch-Waxman context. We could envision a scenario where there is a patent that is being asserted, the earlier patent has expired, the patentee files a terminal disclaimer to the earlier patent, and as Mr. Wexler alluded to, that would get rid of the double patenting problem from an invalidity perspective, but it would not cure the harm that had transpired between the time when the underlying patent expired and the later patent expired. Would your position be different in the context of Hatch-Waxman if the scope of the extension was coextensive with the full scope of the coverage prior to the terminal disclaimer? So, Your Honor, if I have your question correctly, it's whether or not if the 156 extension was not more narrow than the underlying 086 patent, right? Correct. Let's suppose the claims in the patent are the same scope as the coverage that was subject to the extension. That scenario would be difficult to envision simply because the harm that was in this case that occurred was the extension of the underlying earlier 086 patent. So it would be difficult to envision a scenario where a later patent would have identical subject matter that could be extended under Section 156 that would also be the same as... Well, but hypothetically, even if it may be difficult to envision, if that were the case, would your argument be different? No, Your Honor, I don't... Just as a policy matter, in a way, the extension would not have affected any parties other than the parties affected directly by the Hatch-Waxman extension. I would disagree with that, Your Honor, because the other part of this that's getting extended is the 086 patent. There are multiple methods in the 086 patent that use the compounds in the 812 patent. So the 812 compounds are compounds that are used for not just Parkinsonism, as claimed in the 812 patent, but also elevated blood pressure, schizophrenia, and depression. So by the use or by the extension, the improper double patenting, even if the scope were the same between the 812 patent and the 156 extension, the public would still be precluded from using those compounds to practice the inventions of the 086 patent, meaning they would still not be able to use those compounds for a non-approved use, which is primopexol used for Parkinson's disease. The 086 patent still includes elevated blood pressure, schizophrenia, and depression. So the public would be harmed because they would still be prevented from using the inventions in the 086 underlying patent. One move to the 121 issue. The district court seemed to suggest that, well, if we read the statute as it's written, I'd go the other way, but I'm persuaded by my reading of dicta and federal circuit case law to reach the opposite result. Judge Farnon did point out that there was tension between the case law and this court. So how do you persuade us that your brief seems to suggest that you don't necessarily agree that the language of 121 necessarily compels the opposite result here? I don't believe the language. I agree, Your Honor. The language of 121 does not compel, just under the plain language of it, if you accept Beringer's interpretation, compel the opposite result than that reached by Judge Farnon. And the reason being is that the court held, and also in Gerber Garment, that you have to read that section as a whole. You have to read it in its entirety, and you can't just isolate the third sentence of section 121. And so the point of your read is that you don't think this particular patent would be covered because it wasn't as a result of? That's correct, Your Honor. It was not as a result of any divisional application. And this is the only case that has ever presented the issue of whether or not there was a restriction in a grandparent application and then had the double patenting between the parent and the child without an intervening restriction requirement. Well, it seems. I mean, what difference would it make if there was a three-way restriction requirement and as a result there were two separate divisional applications filed and the original application was restricted to one of the three groups as compared with restricting the claims in the first case to one group and then filing a division attempting to get the other two groups facing perhaps a repeat rejection and then filing another division? What difference does it make as long as the patents that ultimately issue have claims that have consonance with the restriction requirement? And hopefully we'll get to address the consonance issue, but to answer your question, the difference that it makes is that it improperly puts on a time-wise extension. So by allowing a divisional to then be filed, by saying the plain language doesn't provide for an intervening restriction, assume that it just is... A time-wise extension in what way? In what way, Your Honor, is that... They all relate back to the original filing date. They would all relate back to the original filing date, but such as in this case, for example, the 812 patent was filed six months after its parent application. So the 812 patent gets a six-month longer extension... You know, has a six-month later expiration date than its parent application, whereas if you... Could I try to understand the context of what you're responding to? If I understand your argument, is that you don't disagree with Judge Lynn's question, that you could file a grandchild application that would be the result of the restriction that would get the earlier filing date under 121. If I understand your argument correctly, and please tell me if I'm mistaken, your argument is that when the 086 patent was filed, you would normally have expected the 812, or at least parts of the 812, to be filed at the same time, to be joined with that, and that you separated... They separated the composition claims out from the utility claims, and that that means that the later filing of the 812 application was not the result of the restriction requirement. Am I understanding that correctly? That's correct, Your Honor. And actually, the 086 patent application, the parent application in this series of applications, actually refiled the entire 15 claims of the 374 patent application without preliminary amendment, without carving out the elected subject matter that was elected in the 374 patent. So in response to Judge Lynn's question, your answer would be, well, fine, you could have grandchildren, great-great-grandchildren, whatever, as long as those applications were filed as the result of the restriction requirement rather than for some other reason, and also that they were constant. Yes, Your Honor. The argument is that the 121 shields the patent that is to be asserted against. So it goes to the target patent, not to the reference patent. The purpose is to shield the 812 patent from invalidity based on the restriction in the 086 patent application. And here the argument is that they split the composition claims from the utility claims because of concerns about an interference from another patent. That's correct, Your Honor. As a matter of fact, the Primapexile compound claim was allowed in the 086 patent application along with the method of use claims. And then after rejection over some of the other claims, Barringer withdrew some of the allowed compound claims and put them into a later application. I don't quite understand that. You made the argument in your brief why we care necessarily about what one of the motivations would have been. I mean, I don't see the statute says as a result. It doesn't say only as one result. So I don't understand whether you're right or wrong on the motivation on the Eli Lilly patent, why that affects how we would apply 121 in this instance. The motivation goes toward whether or not the restriction carried through. And it's probably more relevant in the context of consonants. But the fact is that if you read the prosecution history, which has to be instructive on whether or not the restriction requirement carried through, it needs to carry through all three applications. So if the 812 patent... It carried through on the 86, right? Notwithstanding that in the 86 patent, they didn't follow. You know, as we talked with the other side, the argument is whether or not the restriction requirement consisted of one part or two parts, essentially. That's one way of saying it. And in the 86 patent, the examiner obviously applied the restriction consistent with what your colleague said, because it didn't match the second part of this restriction requirement in terms of the groupings. Am I right about that? The 086 patent did not match the restriction requirement. And the examiner never affirmatively put in a restriction requirement in the 086 patent application. Well, no. The argument is that he was applying the earlier restriction requirement, not adding a new one. No one suggested that was the case. And the prosecution history makes it clear that he didn't follow or require the applicants to follow the earlier restriction requirement. He did put in a double patenting rejection, and the paradino compounds, which were selected for the parent application, were then removed. But there's no reference in any of the patent prosecution histories, either the 086 patent prosecution or the 0812 patent application prosecution histories, that the examiner relied on a 121 argument or imposed the same requirements of selecting one group of compound claims and a method of treating or a process claim. I don't understand what that has to do with it, whether the later examiner was doing that. I mean, if the 0812 application had been consistent with the constance requirement, the examiner had never said anything about consonance or 121. I mean, they'd still get the benefit of 121 if it had been the result of the restriction requirement and there had been consonance. We don't care what the examiner said about it, do we? Correct, Your Honor. If the restriction requirement had carried through, you're not taking the position that it would not apply to a grandchild application. Are you? Just as a matter of principle. As a matter of principle, if the restriction had carried through to the 086 patent application, then the question would be whether or not it carried through to the 0812 patent application. And let's assume it did. And assuming it carried through to the 0812 patent application, then we would be back to consonance and whether or not the claims were filed in consonance with that restriction requirement. And let's assume that there was consonance. You would have no problem with that, correct? I don't believe so, Your Honor. But again, I... Just because it's a grandchild application as opposed to a straight divisional application, it's not the question. That's correct, Your Honor. It's not the dispositive question. There can be a scenario where a parent can be filed as you just set forth. And typically how these cases wind up is there's cousin's patents who are competing against one another. So it's rare for them to be in the same chain and also to have a double patenting violation. Because typically if you're consonant with the restriction requirement, you shouldn't have multiple inventions across patents with one another that would be in violation of the double patenting statute. Typically the consonance would protect that. You mentioned earlier that one of the problems is the time-wise extension. Yes, Your Honor. Of course, for patents filed at that time, any divisional would have the benefit of a time-wise extension of some sort, correct? Even if there were simply divisional applications filed with regard to all of the restricted subject matter, they would all theoretically benefit from some time-wise extension. So long as they don't... In Section 121, it does require that the application be filed prior to the issuance of the patent that was the part of the restriction. Understand. So as long as that time limitation was met, then there would always be... That's the bargain with Section 121, is that you get the earlier priority date as well as the time to prosecute the patent. But part of the bargain is you have to meet both and the consonance requirement. What does consonance mean? There's an MEP definition... MPEP definition of consonance, is there not? Your Honor, for consonance, I would turn to the court's decision in... Well, the MPEP says, if I'm right, consonance means that the claims cannot be changed in material respects from the claims at the time the requirement was made. Is that right? That's correct, Your Honor. 80401. How was that not met here? The claims were not, right? The claims were appended. They were amended during prosecution. The 086 patent application actually added, I think, somewhat 30 or 40 claims based on the four claims that were in the 374 but did expand them in the prosecution history. You'll see reference to the fact that... I thought your argument, though, was the reason it doesn't meet consonance was because it didn't meet the second part of the restriction requirement, which was the first examiner's discussion of how the various groups are combined. That's correct, Your Honor. How is that requirement consistent with how the MPEP defines consonance? The MPEP requires... The way that MPEP... I guess... Excuse me. The MPEP definition of consonance is applicable in light of the restriction requirement that was imposed. Isn't the answer to Judge Prost's question that the MPEP defines consonance too narrowly? Yes, Your Honor. And we would argue that the... And, of course, in the restriction requirement itself, you have the 10 groups that were separated, but you also had the examiner state as part of the restriction that you must elect either one of the compound groups and one of the methods of treating groups or a process claim. In this case, we would separate out the partial... Do you want us to decide this case in a way that would also require that we say that the MPEP is incorrect because it's too narrow? We should therefore expand the whole meaning of consonance, right? Your Honor, I would ask you to solve those two issues by looking to the language of the individual restrictions that are implied. I don't believe that the MPEP's definition of consonance, which is a guide to patent examiners and not necessarily binding authority on this court, look to how that consonance requirement was implemented by Boehringer Ingelheim in light of the restriction requirement language that was imposed. And here, clearly, the Boehringer Ingelheim refiled the 086 application without amendment. They filed all 15 claims. They did not submit a preliminary amendment to take out the elected portions of the claim. And they only then amended the claims once there was a rejection by the examiner. Right. What's wrong with that? I mean, why are we looking just to what they tried to do as opposed to what was done, whether or not it's consistent with the restriction requirement? I don't understand your... Because the examiner didn't impose the restriction requirement again. And second of all, that the consonance was in the application. The cases look to if the application was consonant with the restriction requirement. And here, the 086 patent application and the 812 patent application were consonant with. We reach a conclusion. Your conclusion is that the examiner didn't apply the restriction requirement to the 086. The other side says that, yes, it applied the restriction requirement. It's just a matter of our reading differently the extent of the restriction requirement, right? I think the prosecution history is very clear, and Judge Farnan as well found this when he reviewed it, that the restriction requirement was not applied by the second examiner. The second examiner, there was... It was inconsistent. It was inconsistent. It was inconsistent, right. And Judge Farnan never did reach the... I mean, don't you think there's a basis upon which we would be better served by having the district court in the first instance resolve all of these issues regarding consonance? No, Your Honor. As a matter of fact, because Section 121 is reviewed de novo and all of the evidence that Judge Farnan would look at is also in your hands in the record, Judge Farnan didn't reach the issue, obviously, because he found that there was... the application was not filed as a result of, but I don't know what help Judge Farnan further can give you on the issue of consonance that was not already presented by the parties in their briefing here. Thank you, Your Honors. Thank you very much. Mr. Wexler. Thank you, Your Honor. I'll try to be brief. In response to the question about Section 121, if you look at page A575, you see the examiner sets forth a restriction to one of 10 inventions. A576, the examiner says, they're distinct each from the other. The examiner, the court found at A7 that the restriction requirement was this 10 groups. Mylan Counsel in the notice letter, A3865, characterized the restriction requirement as the 10 groups. The next piece is an election for that patent, the 374 pick, one and one. If the court construes it that way, which is the way Mylan did in the notice letter and the court did in the opinion, then you don't have to reach this issue about an MPEP being in, which is entitled to deference under this court's precedent, being in conflict with... Entitled to deference? Under this court's precedent, the court has said it's a guidance. I'm sorry, I don't have the citation. It's not binding, but it's entitled to so. On deference on a question of substantive law as opposed to a question of procedure? Deference in terms of how prosecution is ordinarily carried out, and I apologize, Your Honor, if I overstate that. Well, the MPEP doesn't purport to give a complete definition of consonance, right? It just says it's not consonant if the claims have been changed. I think, Your Honor, the idea... Is it correct that they don't purport to give a full definition of consonance? I believe they cite the case law and they purport to describe consonance, but I think the case law and consonance, when you look at the case law and consonance, the concern of consonance is when you have a grouping of one subject matter that within that group is nondistinct, one from the other, and you split that into two patents. But if you have two patents claiming distinct subject matter, that's what every patent prosecutor does. And I would submit that, Your Honor, if you look at the violent notice letter, they said the restriction was the 10 groups. The court found that the restriction was the 10 groups. The prosecutor clearly thought it was the 10 groups. And if you were to find that an election for one patent is actually the groups, then that means that in this case they wouldn't have been able to patent all their inventions because they would have put in the first patent a compound and a method, and the second patent would have tried to claim a method, and they would be arguing it violated the restriction requirement. And I ask Your Honors to look at page A279, which is the 374 patent, Claim 1, and page A294, which is the 086, the second patent, Claim 1, and they are both, one is a claim to a compound and the other is to a method of using that compound. They clearly divided out right away between the 374 and the 086 methods and compounds because it was a legitimate way to do the restriction requirement. So we would be in a box that is hopeless if you were to take an election and say that that's a restriction. This is very classic language that appears in patent prosecution histories. And in Pfizer, in BMS, in Geneva, if you look at those cases, the group included both method and compound, and they were struggling to find some restriction that actually separated them into distinct groups. In Geneva, they were arguing that it was an interview. In BMS, there was a second restriction that actually combined into the same group. This is a very clean prosecution in that we have 10 groups. Mylan, again, in the notice letter, never saw a double patenting problem. We never saw a double patenting problem. So I think to say that an election is the restriction in the face of the express language here would really send into disarray how you interpret restrictions, and I don't think it's necessary in this case. And if I could just quickly, I see my time is almost up. On the term extension issue with the terminal disclaimer, if Your Honor looks at A7927, you can see the Department of Justice there talking about this theoretical chilling effect in a 1952 Congress that timing limitations are not important. But what the amendment that was being considered then was a general amendment that said that it has to be done within a reasonable time. The argument here, it seems to me, is somewhat different, and that is that it has to be done before one point in time, which is the expiration. That was not the same as the amendment, right? Your Honor, I agree that it's not identical, but I'm going deeper than that. What I'm saying is that there's a couple of rationales being offered for denying it. In this case, Mylan's within the term extension, so none of this applies to Mylan, but I'm going deeper than that. I'm saying the chilling effect theory applies to regular disclaimers, and Congress took out a timing limitation for that. And I'm saying that the six-month window is somewhat arbitrary in that if you mail in a terminal disclaimer the day before expiration and it arrives three days later at the patent office, that would theoretically be okay. But if you file the next day, it's not. I'm saying patents, the moment they're issued, have effects. And you also have past enforcement that you're giving up through a terminal disclaimer. It's an arbitrary six-month window, and then the rationale of the chilling effect was rejected in the legislative history. So in this case, where Mylan infringes the term extension, they've used our ANDA, the existence of the ANDA is because of our data, the benefits of the Hatch-Waxman. All they really want is to avoid the term extension. And these are technical arguments that I submit that if you had a regular case, Lilly and Leonardo, and you filed that terminal disclaimer, the case would be over because there's nothing left to enforce. So this doesn't really have far-reaching implications into those kinds of cases. Mr. Wexler, your time has expired. I thank counsel for both sides. The case is submitted.